Filed 2/26/15  P. v. Pena CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066481 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF066078) |
| YOLANDA GUADALUPE PENA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, James S. Hawkins, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

The defendant and appellant in this homicide case, Yolanda Guadalupe Pena, was convicted of murdering her three-year-old daughter, Delilah, as well as on separate

counts of assault on a child under age eight resulting in death, torture, and infliction of cruel and unusual punishment resulting in a traumatic condition. (Pen. Code, §§ 187, subd. (a), 273ab, 206, 273d, subd. (a).)[1] On appeal, Pena argues the trial court erred in admitting custodial statements she made denying responsibility for her daughter's death, in failing to give an instruction on involuntary manslaughter, and in denying her *Marsden*[2] motions. Pena also contends that her trial counsel was ineffective and that her right to due process was infringed by admission of uncharged conduct, as well as by an instruction on that conduct and an instruction on statements that reflected a consciousness of guilt.

We find no error and no violation of defendant's constitutional rights. Moreover, with respect to defendant's claims that her Fifth Amendment rights were violated and that the trial court committed instructional error, in light of the overwhelming and uncontradicted evidence of defendant's guilt, and the jury's conviction on all the charges presented to it, we are convinced the asserted errors had no effect on the jury's verdict.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Emergency Response Team*

At approximately 10:00 p.m. on June 25, 2009, a CalFire emergency response team arrived at Pena's home in Riverside County. The team was responding to an emergency call from the residence, and they were met by Pena and her 11-year-old daughter, Jenny. Pena and Jenny pointed the team down a hallway where they found

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

Pena's three-year-old daughter, Delilah. Delilah was in the hallway, on her back, dead. Her body was cold to the touch and, in an indication rigor mortis had occurred, Delilah's arms were stiff and upright at a 90 degree angle from her body.

Pena told a member of the emergency response team: "'It always got what it wanted. It never did what it was told. It always had its way.'" Pena held on to Jenny and would not permit her to be questioned by herself. When a member of the response team asked Jenny what happened, she stated she was watching cartoons when Delilah's body was discovered. Jenny stated that the body had been discovered around noon and that the "baby needed cooling off." Neither Pena nor Jenny could explain why it had taken so long to summon help. At that point, Pena screamed, "'It needed cooling off. It needed help.'"

B. *Interview*

Early on the morning of June 26, 2009 and again on June 30, 2009, Pena was interviewed by a detective at the Indio sheriff's station. Pena attempted to explain Delilah's death and evidence of burns on her body by stating that, on the day of Delilah's death, after Pena had come home from work, Delilah had a tantrum and began throwing herself against the wall and pulled a bowl of hot water off a counter on to herself. Pena tried to explain other, older burns by stating Delilah had been burned by a candle. When confronted with evidence that Delilah had severe bruises and scars on the back of her legs, Pena suggested the possibility that they had been inflicted by Jenny. At the end of the June 30 interview, Pena was placed under arrest.

C. *Pena's Fatal Assault on Delilah*

At trial, Jenny testified against her mother and provided an account of what led to

3

Delilah's death that was dramatically different from the one she gave the emergency response team on the evening of June 25, 2009. According to Jenny's trial testimony, on the day of Delilah's death, Jenny was at home watching Delilah while Pena was at work. One of Pena's house rules prohibited three-year-old Delilah from either speaking to or looking at Jenny or Pena. On the day of her death, Delilah broke this rule and Jenny called her mother and reported Delilah's behavior.

Pena told Jenny that she needed to force Delilah to start walking around the house in a fixed pattern. At this point, this punishment of Delilah was common and required Delilah walk in the pattern for hours on end. Pena, and Pena's friend Lorena, also told Jenny to heat up a cup of water in the microwave every 15 minutes and throw it on Delilah. Jenny did so and testified that the cup of water was so hot she had to use a towel to take it out of the microwave. Pena told Jenny that if Delilah looked at Jenny again, Jenny was to beat Delilah in the buttocks. Pena instructed Jenny to write down what Delilah had done wrong and write down every time Jenny poured hot water on Delilah. Jenny complied with her mother's instructions because she was afraid of what would happen to her if she did not.

When Pena came home, Jenny reported that Delilah had looked at her again. Pena did not respond to Delilah's condition, but to the report that Delilah had looked at Jenny. According to Jenny, Pena went to her bedroom and retrieved a high-heeled shoe. Pena then started hitting Delilah in the head with the heel of the shoe; Pena then threw the child against the wall repeatedly and hit her in the head approximately 20 more times.

When Pena was done beating Delilah, she bound the child's wrists, ankles and face with duct tape, put pantyhose over her head, put her into a plastic tub and put the lid on

4

the tub.  Pena then went to dinner with her friend Lorena and Jenny.  When Pena and Jenny returned from dinner, Jenny went straight to her room.  Later, when Jenny came out of her room, Jenny saw Delilah lying motionless on a towel in the hallway.  Pena took the duct tape off of Delilah and told Jenny to hide it.  Pena called her friend Lorena and asked her what to do; when Jenny confirmed Delilah did not have a pulse, Lorena told Pena to call police and Pena did.  Before the emergency response team arrived, Pena told Jenny to tell them Delilah had repeatedly hit herself, that she was a bad girl, and that she had dropped a pot of hot water on herself.

D.  *Pena's Domestic Relationships and Discipline*

Pena had a third daughter, Jasmine, who was 12 years old at the time of Delilah's death.  Jasmine and other witnesses familiar with the dynamics in Pena's home also testified against Pena.

Both Jasmine and Jenny reported that Pena had an extramarital affair with a man named Daniel and that Delilah was conceived during that relationship.  Jasmine reported what she knew about the affair to her father, and he divorced Pena.  Pena blamed Jasmine for the dissolution of her marriage and began referring to Jasmine as trash.  Pena also blamed Delilah because she believed Delilah was the reason her husband would not reconcile with her.

When Delilah was four or five months old, Sylvia Uribe began babysitting Delilah and Delilah was often with Uribe for days at a time.  Over time, Uribe and Delilah developed a very strong bond which grew to the point that Delilah did not want to go home with Pena.  Eventually, Delilah began living with the Uribe family on a full time basis and Pena agreed that the Uribe family could adopt the child.  However, in

5

connection with the planned adoption, the Uribe family wanted to change Delilah's name to Myra and Pena objected. Disagreement over the child's name led Pena to change her mind about the adoption, and the Uribes returned Delilah to Pena's care.

After Delilah was about one year old, Pena's punishment of the two older girls and, in particular, Jasmine, became unusually cruel and severe. Jasmine would have to clean all the walls in the house, kneel on rice for 30 minutes at a time, and would be beaten for lying.

When Delilah began living with the Uribes on a full time basis, the level and frequency of discipline increased again. On an almost daily basis, Jasmine was forced to kneel on rice or concrete, with her hands on her head, for periods of time longer than 30 minutes. If Jasmine put her hands down, Pena would beat Jasmine with a coaxial cable or plastic coat hanger. Pena would also punish Jasmine by making her sit in a bathtub with either hot or cold water.

When Delilah was returned to Pena's care, the cruelty all three girls experienced became extreme. Jasmine and Delilah were not allowed to look at or talk to Pena or Jenny; they were not allowed to call Pena either "mom" or "Yolanda." Pena referred to Delilah as "trash" or "it." Pena would sometimes shave Delilah's head and call her "Daniel"; in response, Delilah would cry and say that her name was Delilah. If Jasmine expressed sympathy for Delilah or began to cry when Delilah began to cry, Pena would hit Jasmine.

Initially, Delilah was allowed to sleep on Pena's bed; however, Pena eventually made her sleep on the floor on a towel and sometimes tied her to the couch.

Jenny was treated better than her sisters and was considered the "princess" of the

family.  She was expected to report any misbehavior by her sisters to Pena, which for Jasmine included having fun while visiting her father or criticizing Pena.

During this period, when any of the three girls, including Jenny, got into trouble, Pena would spray them with pepper spray or hit them with hangers, the heel of a high-heeled shoe or a coaxial cable.

In addition to kneeling for extended periods, Pena began making Jasmine walk around the house on her knees causing the child's knees to bruise, bleed and scar.  Delilah was not required to get on her knees; instead, as punishment for infractions of house rules, she was forced to walk around the house in the "walking pattern."

Pena also used food to punish Jasmine and Delilah.  She mixed a concoction of beans, two kinds of bread, hot sauce, a can of chili, and an egg, which Jasmine hated, and forced the two girls to eat it.  If they did not eat it, spit it out or vomited, Pena pepper sprayed them or subjected them to another punishment.

In addition to the foregoing, Pena subjected Jasmine and Delilah to three other forms of cruel discipline: hot needles; drenching them with boiling water and ice water; and restraining them with belts, ties, rope, shoestrings and duct tape.

Pena would heat needles on the stove and put the needles on Jasmine's and Delilah's skin, causing them to scream in agony.  Pena would leave the needles on the girls until the needles cooled.

Regularly, Pena would boil water in pots on the stove, pour it into the bathtub and then force either Jasmine or Delilah, who were naked, to sit in the tub with their hands on the bottom of the tub.  When the girls were sitting in the tub Pena would take a cup and pour the boiled water over them so that their entire bodies would feel the hot water.  Pena

7

would at times have Jenny participate in pouring hot water over her sisters. When Jasmine would attempt to resist sitting in the tub, Pena would beat her head and face and throw her against a wall; one time Pena split Jasmine's lip.

Alternatively, Pena would fill the bathtub with cold water and ice and force either Jasmine or Delilah to get in to the bathtub naked and again put their hands on the bottom of the tub. Pena or Jenny would then use a cup to pour ice water over the girls' heads. Delilah would calmly accept the ice water, but Jenny saw her shiver, her skin turn grey and her lips turn purple.

Pena would also punish Delilah by sticking her head in the toilet and forcing it under the water. Jenny testified that when Pena did this she could hear the sound of bubbles.

When Pena left her house, she would tie Jasmine up with tape and rope and put her in a closet. Jasmine's hands would be tied to a railing at the top of the closet and she would be forced to kneel in the closet the entire time Pena was gone.

The restraints used on Delilah were more extreme. For a week at a time, Delilah would be tied up to a faucet and a bar; because of the length of time she was restrained, Delilah would defecate and urinate in her pants. When Delilah was released, Pena would force Jasmine to clean up the mess.

At other times, Pena would put a sock in Delilah's mouth, put duct tape over her mouth, tie her hands and feet with shoelaces or ties and duct tape, and put her in a blue plastic tub, which was placed in a closet. Pena and Jenny would then leave the house with Delilah tied up in the closet.

The binding of Delilah's left hand was so severe that she lost circulation in two of

8

her fingers on her left hand and they began to shrivel and turn black. When this happened, Pena used scissors to cut off the ends of the two fingers.

E. *Autopsy*

An autopsy showed that Delilah died as the result of continuous blunt force trauma inflicted to her head. The examination showed she had suffered significant brain trauma and numerous bruises, impact marks, and cuts all over her head and eyes, as well as subdural bleeding. The post mortem examination showed that Delilah's cheeks were bruised and missing skin. The examination also disclosed significant recent burns on the anterior portions of Delilah's left and right arms; the burns were so serious that in those areas Delilah's skin had begin to slough off.

In addition to showing the cause of death, the autopsy showed that, before her death, and over a significant period of time, Delilah had been subjected to severe physical abuse. Her chest was covered with second degree burns and blistering; her wrists, legs, knees, and feet had significant scarring, bruising and abrasions consistent with being struck or whipped with a cord or clothes hanger.

Delilah's left hand and thumb were so scarred that her hand could no longer be opened but was in a permanent "claw-like" position. Scars on Delilah's left thumb had fused it to the palm of her hand.

The examination showed that two of the fingers on Delilah's left hand had been partially amputated as a result of some nonmedical intervention or occurrence. Only one of three bones in her left pinky finger remained on her hand, and two of three bones remained on her left ring finger. The second bone of her ring finger was protruding out of her skin and, at the time of the examination, had turned brown due to exposure to air.

9

Delilah weighed 28 pounds at the time of her death.

F. *Trial*

Pena was initially charged in an eight-count indictment with: first degree murder (§ 187, subd. (a); count 1); assault on a child under the age of eight resulting in death (§ 273ab; count 2); torture (§ 206; count 3); and five counts of willful infliction of cruel and unusual punishment resulting in a traumatic condition (§ 273d, subd. (a); counts 4-8). At trial, Pena moved to dismiss four of the section 273d, subdivision (a) counts, which were based on Pena's treatment of Jasmine, on the grounds that the abuse of Jasmine was a continuous course of conduct. The trial court granted the motion.

Pena did not offer any evidence in her defense. Rather, her counsel argued that given Jenny's admitted role in pouring scalding water over Delilah on the day of her death, there was a reasonable possibility Jenny, rather than Pena, inflicted the fatal injuries on Delilah. As we indicated at the outset, the jury found Pena guilty on all counts presented to it.

The trial court sentenced Pena to consecutive terms of 25 years to life on the murder count, life with the possibility of parole on the torture count, and one year four months on the infliction of cruel and unusual punishment count. In addition, the court imposed a 25-years-to-life sentence on the conviction for assault causing the death of a child, but stayed the sentence under section 654.

DISCUSSION

I

Prior to trial, Pena moved to suppress the statements she made to sheriff's detectives early on the morning following Delilah's death. The trial court found that Pena

10

waived her *Miranda* rights prior to making statements to the detectives and that a request to delay the interview, which Pena made immediately before the interrogation began, was not an invocation of her right to remain silent. Contrary to her argument on appeal, we find no error in the trial court's determination that Pena did not invoke her rights under the Fifth Amendment. Moreover, as we have indicated, the record shows admission of the statement did not affect the jury's verdict.

A. *Pena's Statement to Detectives*

Early in the morning after Delilah's death, sheriff's officers brought Pena to the substation in the back of a patrol car. When sheriff's detectives began interviewing Pena, the following colloquy occurred:

"[Detective] Corey: Yolanda, I wanna talk to you about what happened tonight. Okay?

"But since you came down here, you were brought down here in the backseat of a police car, and you've been sitting out there on the bench, with the deputy there with you.

"Uhm, what I wanna do is I wanna read you your rights, okay? I have to read these to you since you came down here, you know, in the back of a police car. But I just want you to be aware of 'em, okay?

"Pena: (*inaudible*)

"Corey: You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.

"Do you understand each of these rights I've explained to you?

11

"Pena: (*inaudible*)

"Corey: Is that a yes?

"Pena: (*unintelligible*)

"Corey: Yolanda? You okay? Do you understand those?

"Pena: (inaudible)

"Corey: I need to hear it from you.

"Pena: Yes.

"Corey: Okay. [¶] Having those rights in mind, would you like to answer some of my questions?

"Pena: Does it have to be right now?

"Corey: Ah, I'm sorry, I can't hear you.

"Pena: Does it have to be right now?

"Corey: Well, it doesn't have to be right now. Uhm, we're here now. It's a choice that's up to you. I'm just advising you of your rights because you did come down here in the back of [a] police car. [¶] I want to hear your side of the story. Hear your side of what happens [*sic*]. We can, you know, get a better understanding of what occurred. [¶] So, it's a decision that, ah, that you have to make.

"Pena: I just lost my child. (*whispering*) I can't talk right now.

"Corey: Okay. You want a couple of minutes to . . . to sit here and think? [¶] Would you like a glass of water?

"Pena: (*whispering*) I'm fine, thank you.

"Corey: Okay. Sit tight. okay."

At that point in the interview, Detective Corey left Pena alone in the interview

12

room for seven and a half minutes. Detective Corey then returned to the room with another detective and resumed the interview:

"Corey: Hey [*sic*] you go, Yolanda. I brought you some water. Okay? I know you said you were okay, but I brought you some here for you. Okay? [¶] Now, I know that you said . . . you just couldn't talk, 'right now.' I just -- I wanna clarify that with you. [¶] Ah, you know, we have our investigation going on. You know, we have several different things going on, at this time, um. You know, we've talked to Jenny. Um, Jenny didn't' really give us a lot of information to kind of go on, and so, we need to be able to put these pieces of the puzzle together, and try and figure out what happened to your daughter. [¶] Do you understand that? So, I just, I want to find out from you, if we're able to, if we're able to talk, and if you can help us put those pieces of the puzzle together. If you can help make this clear to us what happened. 'Kay? Is that something we can do?

"Pena: (*inaudible*)

"Corey: Is that a yes?

"Pena: Yes.

"Corey: Okay. Do you remember those rights that I read to you, correct?

"Pena: (*unintelligible*)

"Corey: Is that a yes?

"Pena: Yes.

"Corey: Okay. And you remember that I asked you if you were willing to answer some questions?

"Pena: Yes.

13

"Corey: Okay. And are you willing some of my questions [*sic*]?

"Pena: Yes.

"Corey: Okay. . . ."

After reviewing a videotape of the interview, the trial court found that at the foregoing juncture in the interview, before any substantive interrogation took place, detective Corey was not intimidating, coercive or deceptive, but instead "I think . . . he was being very, very gentle with her and asked her if she was fine, if she's able to talk to him." The trial court further found that when Pena told detective Corey that she could not talk "right now," she was not invoking her constitutional right to remain silent but, instead, was only expressing her emotional difficulty in speaking about Delilah's death. The trial court found that in this regard her statement was not ambiguous. Accordingly, the trial court denied Pena's motion to suppress the statements Pena thereafter made to the detectives.

B. *Governing Principles*

"'The prosecution bears the burden of demonstrating the validity of the defendant's [*Miranda*] waiver by a preponderance of the evidence.' [Citations.] In addition, '[a]lthough there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was [voluntary,] knowing[,] and intelligent under the totality of the circumstances surrounding the interrogation.' [Citation.] On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence. [Citation.]" (*People v. Williams* (2010) 49 Cal.4th 405, 425 (*Williams*).)

14

In determining whether a defendant has in fact waived his or her *Miranda* rights, and the inquiry law enforcement officers may make in resolving any doubt on the issue, we must consider both the subjective intentions of the accused and the objective impact the accused's statements have on law enforcement officers. As the court in *Williams* stated: "With respect to an initial waiver, . . . '[a] valid waiver need not be of predetermined *form*, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision.' [Citations.]

"This court has recognized that 'when a suspect under interrogation makes an ambiguous statement that could be construed as an invocation of his or her *Miranda* rights, "the interrogators may *clarify* the suspect's comprehension of, and desire to invoke or waive, the Miranda rights."' [Citations.]

"Whereas the question whether a waiver is knowing and voluntary is directed at an evaluation of the defendant's state of mind, the question of ambiguity in an asserted invocation must include a consideration of the communicative aspect of the invocation— what would a *listener* understand to be the defendant's meaning. The high court has explained—in the context of a postwaiver invocation—that this is an objective inquiry, identifying as ambiguous or equivocal those responses that 'a reasonable officer in light of the circumstances would have understood [to signify] only that the suspect *might* be invoking the right to counsel.' [Citations.] This objective inquiry is consistent with our prior decisions rendered in the context of analyzing whether an assertion of rights at the initial admonition stage was ambiguous. [Citation.] We note that a similar objective approach has been applied by the United States Court of Appeals for the Ninth Circuit to identify ambiguity in a defendant's response to a *Miranda* admonition; a response that is

15

reasonably open to more than one interpretation is ambiguous, and officers may seek clarification. [Citation.]

"In certain situations, words that would be plain if taken literally actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends. In those instances, the protective purpose of the *Miranda* rule is not impaired if the authorities are permitted to pose a limited number of followup questions to render more apparent the true intent of the defendant." (*Williams*, *supra*, 49 Cal.4th at pp. 427-429.)

In *Williams*, the defendant was arrested on a Saturday and, later that afternoon, after being advised of his *Miranda* rights, initially indicated he wanted an attorney present. However, upon further questioning, the defendant indicated that rather than wait until the following Monday when an attorney would be available, he was willing to go forward with the interrogation without an attorney. In finding that the officers acted properly in making it clear to the defendant that an interrogation would have to wait two days if the defendant wanted an attorney and thereafter obtaining his express consent, the court stated: "In the present case, defendant had indicated to the officers that he understood his rights and would relinquish his right to remain silent. When asked whether he also would relinquish the right to an attorney and to have an attorney present during questioning, defendant responded with a question concerning timing. In light of defendant's evident intent to answer questions, and the confusion observed by [the detective] concerning when an attorney would be available, a reasonable listener might be uncertain whether defendant's affirmative remarks concerning counsel were intended to invoke his right to counsel. Furthermore, under the circumstances, it does not appear

16

that the officers were 'badgering' defendant into waiving his rights; his response reasonably warranted clarification. [Citations.]" (*Williams*, *supra*, 49 Cal.4th at p. 429.)

In *People v. Clark* (1993) 5 Cal.4th 950, after invoking his right to remain silent, the defendant later engaged investigators with respect to his likely penalty and agreed to speak to them. In the course of doing so he repeatedly remarked to the investigators "'What's a lawyer going to do for me?'" (*Id*. at p. 983.) The defendant also expressed confusion and self-pity. However, at the end of the discussion of his rights, the defendant stated: "'Yeah, I'll talk. I don't care.'" (*Ibid*.) In finding nothing improper in the investigators conduct in clarifying the defendant's willingness to speak, the court stated: "Even assuming that these comments, separately or in tandem, could be construed as an ambiguous request for counsel, the conduct of the interrogators was proper and defendant's subsequent waiver was valid. When the person under interrogation makes an ambiguous statement that could be construed as a request for counsel, the interrogators may clarify the suspect's comprehension of, and desire to invoke or waive, the *Miranda* rights. [Citations.] The colloquy regarding defendant's rights consisted of such permissible clarification. The interrogators did not ask defendant substantive questions until defendant's position was clarified and a valid waiver was obtained. Moreover, no coercive tactics were employed in order to obtain defendant's *Miranda* waiver." (*Id.* at p. 991, fn. omitted.)

C. *Analysis*

Contrary to Pena's argument on appeal, the record does not show that she invoked her right to remain silent or that Corey in any manner acted improperly.

The record is clear that Pena was not under any coercion. The record also shows

that her reluctance to speak immediately with Corey was, as the trial court found, based on her emotional state and not on any desire to assert the rights that had been explained to her and that she agreed to waive. This is manifest both on the face of her statement, which directly referred to her emotional state, and in the context in which the statement was made; in particular, we note the caution Corey took in giving Pena time alone and then confirming that she was willing to talk to him. From an objective point of view, Pena's statement did not reflect any intention to assert her *Miranda* rights but instead was, as is obvious from the statement itself and the overall context, a description of Pena's emotional state. Thus, as the trial court found, Corey acted properly in simply confirming that fact with Pena. Accordingly, the trial court did not err in denying Pena's motion to suppress.

D. *Prejudice*

Even if there were a *Miranda* violation, on this record admission of Pena's initial interview was harmless. In the initial interview, and later in the second interview, Pena denied responsibility for Delilah's death and made no statement that was directly incriminating. Pena's statements to Corey at the initial interview were damaging to her case only in the sense that her effort in the interrogation to blame Delilah for her own injuries and death and, inferentially, Jenny, reflected both a consciousness of guilt and callousness on her part. Given the other overwhelming and unrebutted evidence of Pena's guilt, including, in particular, the autopsy evidence that corroborated both of her surviving daughters' testimony about her extreme cruelty and brutality toward Delilah, admission of her exculpatory statements was harmless beyond any reasonable doubt. (See *People v. Sims* (1993) 5 Cal.4th 405, 448 [other overwhelming and unrebutted

18

evidence of guilt made admission of confession harmless beyond a reasonable doubt].)

II

Next, Pena argues the trial court should have given the jury a sua sponte instruction on involuntary manslaughter based on commission of felony child abuse or endangerment, as proscribed by section 273a, subdivision (a). We find no error in the trial court's failure to instruct on this theory of involuntary manslaughter; moreover, once again we find that, in any event, the asserted error would not have affected the jury's verdict.

A. *Governing Principles*

"In a criminal case, a trial court must instruct on general principles of law relevant to the issues raised by the evidence, even absent a request for such instruction from the parties. [Citation.] The obligation extends to instruction on lesser included offenses when the evidence raises a question as to whether all the elements of the charged offense were present, but not when there is no evidence that the offense committed was less than that charged. [Citation.] [¶] . . . However, the 'substantial' evidence required to trigger the duty to instruct on such lesser offenses is not merely '*any* evidence . . . no matter how weak' [citation], but rather '"evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]"' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664.)

In homicide cases where the evidence leaves no reasonable doubt the defendant acted with an intent to kill or with a conscious disregard for life, no sua sponte instruction on involuntary manslaughter is required. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 588 (*Manriquez*); *People v. Guillen* (2014) 227 Cal.App.4th 934, 1027 (*Guillen*).)

19

In *Manriquez*, the defendant was convicted of the murder of a romantic rival. After his arrest, the defendant told officers that he pulled his gun on the victim and placed the barrel against the victim's stomach and that the gun discharged as he pushed the victim backwards. In finding this evidence insufficient to support an involuntary manslaughter instruction, the court stated: "The killing of Efrem Baldia can only be characterized as having been intentional. The victim suffered two fatal and three nonfatal gunshot wounds inflicted at close range. Even if we were to accept defendant's statement, made during his hospital interview with Detective Olmedo, that the first shot simply 'discharged' when defendant pushed the victim, the autopsy evidence introduced in the testimony given by Dr. Rogers established that defendant thereafter inflicted a second fatal wound when, by defendant's own admission to Detective Olmedo, he continued shooting the victim as the victim was falling to the ground. Thus, even if defendant unintentionally fired the first shot, the trial court was not required to instruct the jury on involuntary manslaughter in view of the circumstance that defendant intentionally kept firing his weapon, inflicting at least one other fatal wound." (*Manriquez*, at p. 588.)

The court in *Guillen* reached a similar conclusion. In that case, the victim was in a local jail and was beaten and kicked to death by other inmates who believed he was a child molester. The other inmates were convicted of second degree murder and, on appeal, argued that the trial court erred in failing to instruct on a theory of negligent involuntary manslaughter. In rejecting this contention, the court stated: "Here, the record is devoid of evidence from which a reasonable jury could conclude appellants were guilty of involuntary manslaughter on the theory they were criminally negligent. The evidence detailed above demonstrates each appellant committed an act endangering

20

[the victim's] life, i.e., each appellant participated in the assault by hitting, kicking, or stomping [the victim]. Additionally, there was evidence each appellant realized the danger and acted in total disregard of that danger. There was evidence each appellant participated in or was sufficiently aware of the CAR system and that child molesters were despised in jail and there were no rules for taxing child molesters. Based on the record before us, there is no question each appellant knew the risk involved to [the victim]when they violently attacked him. This was a case where each of the appellants, if he was guilty at all, was guilty of the greater offense of second degree murder and not of the lesser included offense of involuntary manslaughter. Thus, the trial court did not err in failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter based on a noninherently dangerous felony assuming that is a legally correct theory of law." (*Guillen*, *supra*, 227 Cal.App.4th at pp. 1027-1028.)

B. *Analysis*

Here, the theory of involuntary manslaughter offered by Pena is undermined by the overwhelming evidentiary record. As we have discussed, the killing of another committed with either an intent to kill or conscious disregard for life is, at the very least, voluntary manslaughter. (See *Manriquez*, *supra*, 37 Cal.4th at p. 588; *Guillen*, *supra*, 227 Cal.App.4th at pp. 1027–1028.) This record compels the conclusion that the beating which inflicted fatal injuries on Delilah's head was committed with, at the very least, a conscious disregard for Delilah's life. Pena's disregard for Delilah's life is of course manifest in the undisputed circumstances that led up to the fatal attack. By all accounts, Delilah's life in the months before her death was an unending train of sadistic physical and mental abuse. As we have noted and are required to repeat, in the months before her

21

death: Delilah was tied to a rail for literally a week at a time and left to defecate in her clothes; on more than one occasion she was bound, gagged and placed in a plastic tub; she regularly endured alternating scalding and freezing baths, as well as beatings with hangers and the heels of high heeled shoes. The scalding baths fused Delilah's left thumb to her palm; the restraints placed on Delilah strangled two fingers on her left hand; and, in a striking revelation of Pena's disregard for her daughter's well-being, Pena simply cut the dead portions of the child's fingers off. In the act that killed Delilah, while skin was literally sloughing off the child's burned body, Pena beat the 28 pound three year old in the head with the high heel of a shoe, repeatedly threw her against a wall and then, once again, bound her with duct tape and stuffed her in a plastic tub. Given this undisputed evidence, a reasonable jury could not find that Pena had any regard for the likelihood the child would die. No involuntary manslaughter instruction was appropriate here.

C. *Prejudice*

Even if a sua sponte instruction on involuntary manslaughter was required here, the failure to give it did not prejudice Pena. We review the prejudice that arises from the erroneous failure to give a sua sponte instruction under the familiar standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. Such an error requires reversal only if "'after an examination of the entire cause, including the evidence' [citation], it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (*People v. Breverman* (1998) 19 Cal.4th 142, 178, fn. omitted; accord, *People v. Blakeley* (2000) 23 Cal.4th 82, 93.)

Here, the jury was fully instructed on murder as well as voluntary manslaughter. Given the fairly powerful proof that Pena acted with a conscious disregard for life, we

22

cannot conclude that, had an involuntary manslaughter instruction based on violation of section 273a, subdivision (a), also been given, the jury would have found her guilty of that crime rather than murder.[3] The fact that the jury, having been fully instructed on murder and voluntary manslaughter, found Pena guilty of murder confirms this conclusion. The CALCRIM No. 520 instruction the jury was given on murder requires a finding malice, which the instruction defined as an act performed with either an intent to kill or conscious disregard for life.[4] Thus, the jury's murder verdict by itself shows that it necessarily found Pena acted with an intent to kill or a conscious disregard for life. In this context, there is no reasonable probability an involuntary manslaughter instruction based on section 273a, subdivision (a) would have given rise to a more favorable result.

---

3    We recognize the trial court, in an apparent abundance of caution, did give an involuntary manslaughter instruction on a theory that Pena was negligent. The trial court's provision of that instruction did not require that it provide additional theories of involuntary manslaughter.

4    CALCRIM No. 520 states in pertinent part: "The defendant acted with *implied malice* if: [¶] 1. (He/She) intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time (he/she) acted, (he/she) knew (his/her) act was dangerous to human life; [¶] AND [¶] 4. (He/She) deliberately acted with conscious disregard for (human/ [or] fetal) life."

III

While her case was pending and then again at trial, Pena requested, by way of five separate *Marsden* motions, new counsel. The trial court denied each of her motions. On appeal, Pena argues the trial court abused its discretion in denying the motions and that, as a consequence, she was deprived of the effective assistance of counsel. We find no abuse of discretion and, hence, no deprivation of Pena's right to counsel.

A. *Pena's Marsden Motions*

Delilah was killed on June 25, 2009, and Pena was charged in a felony complaint filed on July 6, 2009. Trial commenced almost four years later, on May 30, 2013.

Pena made pretrial *Marsden* motions on January 14, 2010, June 14, 2010, January 3, 2012, and May 31, 2012. In each of these pretrial motions, Pena complained successively that her attorney was not keeping her informed about the progress of the case and the result of any investigation and that she had lost trust in him. In response to the successive motions, trial counsel successively explained that he was waiting for discovery from the prosecution, that he was working with his investigator, that he had been in contact with Pena when he thought it would be productive and that, in addition, he had been busy with other trials. In each instance, the trial court found that counsel was performing his duties adequately and denied Pena's pretrial motions.

Near the end of trial, Pena made a fifth *Marsden* motion. In her fifth motion, Pena complained counsel had not called any witnesses on her behalf. Counsel explained that this was a tactical decision based on his assessment of problems with witnesses and the potential they would produce damaging testimony. The trial court denied Pena's fifth *Marsden* motion.

24

B. *Governing Principles*

"'When a defendant seeks substitution of appointed counsel pursuant to *People v. Marsden*, *supra*, 2 Cal.3d 118, "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result."' [Citation.] 'A trial court should grant a defendant's *Marsden* motion only when the defendant has made "a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation."' [Citation.]" (*People v. Streeter* (2012) 54 Cal.4th 205, 230.)

Importantly, incompetence and inadequacy of counsel are not a direct function of "the number of times one sees his attorney, and the way in which one relates with his attorney." (*People v. Silva* (1988) 45 Cal.3d 604, 622.) In this regard, a defendant's claim that he or she does not trust appointed counsel will not, by itself, require substitution. "'If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law.'" (*People v. Myles* (2012) 53 Cal.4th 1181, 1207.) It is axiomatic as well that we give great deference to counsel's reasonable tactical decisions. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Frye* (1998) 18 Cal.4th 894, 979.)

"'We review the denial of a *Marsden* motion for abuse of discretion.' [Citation.]

25

'Denial is not an abuse of discretion "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel."' [Citation.]" (*People v. Streeter*, *supra*, 54 Cal.4th at p. 230.)

C. *Analysis*

The record here fully supports the trial court's implied conclusion that, during the four-year course of pretrial proceedings, counsel adequately informed Pena with respect to the progress of her case and his efforts to provide her a defense and provided her with a meaningful opportunity to assist in her own defense. In this regard, appointed counsel is not required to provide a criminal defendant with constant and instantaneous responses to all her concerns; rather, counsel's conduct, and level of contact, is measured by whether it is sufficient under the circumstances to meet the charges made against the defendant. Here, the record shows that counsel did advise Pena of developments in the case as they occurred and did consult with her with respect to possible avenues of defense. Indeed, at one point, Pena conceded that counsel had kept her informed and had discussed the details and intricacies of her case with her.

With respect to counsel's decision not call any witnesses on Pena's behalf, given the quantum and nature of the prosecution's case, we must defer to this obvious and reasonable tactical choice.

In sum, the trial court did not err in denying Pena's *Marsden* motions and, thus, did not deprive her of her right to the effective assistance of counsel.

IV

Pena also raises related constitutional challenges to Evidence Code section 1109 and CALCRIM No. 852. Although evidence of a defendant's propensity to commit a

26

crime is in general inadmissible (see Evid. Code, § 1101, subd. (a)), Evidence Code section 1109, subdivision (a)(1) provides an exception to the general rule. Evidence Code section 1109 states: "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Consistent with Evidence Code section 1109, subdivision (a)(1), and Jenny's testimony with respect to the abuse she endured, the trial court gave the jury a version of CALCRIM No. 852, which permitted them to consider that testimony in determining whether Pena was guilty of assault causing the death of a child and/or infliction of physical punishment on a child.[5]

---

[5] The version of CALCRIM No. 852 provided to the jury stated: "The People presented evidence that the defendant committed domestic violence that was not charged in this case.
    "Domestic violence means abuse committed against a child of the defendant.
    "Abuse means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.
    "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.
    "If the People have not met this burden of proof, you must disregard this evidence entirely.
    "If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit assault causing the death of a child and/or infliction of physical punishment on a child, as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove

Contrary to Pena's argument on appeal, Evidence Code section 1109, subdivision (a)(1) is not subject to attack on due process grounds. In *People v. Falsetta* (1999) 21 Cal.4th 903, 919-920 (*Falsetta*), the court held that analogous provisions of Evidence Code section 1108, which permits admission of evidence of prior sex offenses to be admitted when sex crimes have been charged, were valid. The court found that evidence of a defendant's other sex offenses constituted relevant circumstantial evidence of charged sex offenses and that admission of such evidence did not violate due process so long as the jury was instructed in a manner which is now set forth in CALCRIM No. 852. (*Ibid.*) Adopting the reasoning in *Falsetta*, our courts have consistently upheld the validity of Evidence Code section 1109. (See *People v. Brown* (2011) 192 Cal.App.4th 1222, 1233, fn. 14, and cases cited therein.)

Contrary to Pena's argument, the court's opinion in *Garceau v. Woodford* (9th Cir. 2001) 275 F.3d 769, 777 (*Garceau*), does not in any manner call into question the validity of either *Falsetta* or the cases that have applied *Falsetta* to Evidence Code section 1109. In *Garceau*, the prosecution was erroneously permitted to introduce propensity evidence that did not fall within any exception to the general rule barring such evidence. (See Evid. Code, § 1101.) Here, as in *Falsetta*, there is a specific and constitutional exception to the general rule.

In a related argument, Pena contends CALCRIM No. 852 is invalid because she asserts that it interferes with the presumption of innocence and permits a finding of guilt

that the defendant is guilty of assault causing the death of a child and/or infliction of physical punishment on a child. The People must still prove each charge beyond a reasonable doubt.

"Do not consider this evidence for any other purpose."

28

on evidence that fails to meet the required standard of proof beyond a reasonable doubt. This argument was expressly rejected by our Supreme Court in *People v. Reliford* (2003) 29 Cal.4th 1007, 1009-1016, as well as the opinions in *People v. Johnson* (2008) 164 Cal.App.4th 731, 738-740 and *People v. Reyes* (2008) 160 Cal.App.4th 246, 250-253. We of course are bound the court's opinion in *People v. Reliford*, *supra*. (See *People v. Johnson*, *supra*, 164 Cal.App.4th at pp. 739-740, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In sum then, both admission of Jenny's testimony about abuse she suffered and the use of CALCRIM No. 852 with respect to that testimony were proper. Again, however, we must note the overwhelming and damning evidence that far more directly established Pena's guilt of both the murder of Delilah and the abuse of Jasmine; in light of that evidence, any error with respect to the uncharged conduct was not, under any standard, prejudicial.

V

The trial court also instructed the jury with a version of CALCRIM No. 362 which stated: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show she was aware of her guilt of the crime and you may consider it in determining her guilt.

"If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

In light of the direct conflict between the version of Delilah's death Pena provided

29

to sheriff's deputies and the version Jenny presented at trial, the record fully supported use of CALCRIM No. 362. We reject Pena's contention that CALCRIM No. 362 itself is defective. As the Supreme Court stated in approving the nearly identical language set forth in CALJIC No. 2.03: "Contrary to defendant's claim, the jury could quite reasonably conclude that defendant made a series of false statements to deflect suspicion from himself. [Citation.] We have repeatedly rejected arguments attacking the instruction [citations] and do so again." (*People v. Howard* (2008) 42 Cal.4th 1000, 1025.) More particularly, contrary to Pena's argument on appeal here, in advising the jury that they may consider evidence of consciousness of guilt "in determining" the ultimate question of a defendant's guilt, CALCRIM No. 362 does not improperly advise the jury that consciousness of guilt is evidence of guilt. Rather, like CALJIC No. 2.03, CALCRIM No. 362 makes it clear that the jury is to decide the meaning and importance of any consciousness of guilt they find. (See *Turner v. Marshall* (9th Cir. 1995) 63 F.3d 807, 820.)

Thus, the trial court did not err in instructing the jury with CALCRIM 362. As we have noted previously, in light the overwhelming and undisputed evidence of guilt, any error on this collateral issue was not prejudicial.

DISPOSITION

The judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

NARES, J.

30

IRION, J.